STATE OF MAINE                                    SUPERIOR COURT
KENNEBEC, ss.                                     CIVIL ACTION
                                                  DOCKET NO. _____

PAMELA TREADWELL,                      )
an adult individual resident of Sidney, )
County of Kennebec, and                )          **JURY TRIAL REQUESTED AND**
State of Maine,                        )          **INJUNCTIVE RELIEF SOUGHT**
                                       )
        Plaintiff,                     )
                                       )
        v.                             )
                                       )
VESCOM CORPORATION, a foreign          )
corporation registered to do business in the )
State of Maine, AMERICAN GUARD         )
SERVICES, a California Corporation,     )
WORLDWIDE SOURCING GROUP,              )
a Delaware Corporation, and OUSAMA     )
KARAWIA, an individual residing        )
in California,                         )
                                       )
        Defendants                     )

## COMPLAINT

NOW COMES the Plaintiff, Pamela Treadwell, and makes the following complaint

against Vescom Corporation, American General Services, Worldwide Sourcing Group, and

Ousama Karawia. Vescom is a company providing guard and security services. Treadwell, an

employee of defendants, was targeted after reporting illegal conduct to the owner of Vescom,

Sherif Assal, on November 27, 2013. The illegal conduct included insurance and wage fraud,

taking kickbacks, and violation of licensing laws. She also had to leave her job in order to avoid

engaging in illegal conduct herself in terms of failing to pay employee wages, a violation of both

state and federal law. Karawia, a convicted felon, was not only illegally working for Vescom but

threatened to allow all the payroll checks to bounce, knowing that Treadwell's name was on the

checks. Treadwell resigned in order not to be part of Karawia's plan to defraud employees of

their wages and defendants' plan to file licensing paperwork fraudulently claiming compliance

when in fact Karawia's presence as a felon violated the law.

**NATURE OF THE ACTION**

1.       This is an action under the laws of the State of Maine, including the Maine

Human Rights Act (hereinafter, the "MHRA"), 5 M.R.S. § 4551, *et seq.*, the Whistleblowers'

Protection Act, 26 M.R.S. § 831 *et seq.* ("the WPA"), and Maine's Equal Pay Act, 26 M.R.S. §

628.

**PARTIES**

2.       Plaintiff Pamela Treadwell a resident of the town of Sidney, Kennebec County,

State of Maine.

3.       Vescom Corporation is an Illinois corporation with corporate headquarters in

Hampden, Maine.

4.       Vescom claims to be one of country's largest privately owned security guard

companies.

5.       Vescom had 201 or more employees for each working day in each of 20 or more

calendar weeks in the same calendar year as, or in the calendar year prior to, when the illegal

conduct alleged in this case occurred.

6.       Vescom and American Guard Services ("AGS") are integrated employers with

and under the Worldwide Sourcing Group ("WSG") corporate umbrella.  All three of these

companies are owned and controlled by Sherine and Sherif Assal.

7.       WSG is an umbrella company that the Assals use to consolidate all of their

companies.

8.       WSG, AGS and Vescom not only have common ownership and common

management, the three entities also share the same reporting channels, and shared human

resources coverage.

9.       Sherine Assal was on the AGS payroll.  She directed Vescom employee activities,

including tasks that needed to be accomplished and how those tasks should be accomplished for

2

Vescom employees including Treadwell, Kathy Goodwin, Vescom's Director of Finance, and other administrative support personnel like Tina Baughman, Payroll Manager/H.R., and Carol Honnell, Accounts Payable/Accounting Clerk.

10.    Ousama Karawia was employed by AGS and paid through defendants like a salaried employee.

11.    Sherine Assal and Karawia controlled and directed the activities of Treadwell, Goodwin, Baughman, and Honnell.

12.    Treadwell reported to Sherif Assal but, in financial matters, reported to Sherine Assal, who worked for AGS.

13.    The ultimate control of the management team was under Sherif and Sherine Assal and Ousama Karawia; Treadwell's salary was dictated by Sherif Assal; her benefits were controlled and affected by Karawia.

14.    At the time that Treadwell was forced out, many of Vescom's administrative and financial duties were combined with AGS and other entities owned by the Assals; for example: workers' compensation, general liability, and auto insurance policies were combined.

15.    At some point, the Assals began having Vescom staff report to AGS staff for various human resource functions, financial functions, purchasing, and IT, among other things.

16.    WGS, AGS and Vescom operations were interrelated.  For example, AGS and Vescom have the same staff and the same offices in addition to the same human resources and the same reporting channels.

17.    Vescom, AGS, and WGS also share legal counsel.  Indeed, defendants' filings with the Maine Human Rights Commission were on Vescom letterhead, using WSG's Carson, California address.

18.     AGS and Vescom computers were networked together so that AGS had all the Vescom employee files, AGS and Vescom could make and share the same account entries, and AGS and Vescom could simultaneously access the shared accounting program every day.

19.     Funds were debited from Vescom's checking account in the amount of $10,000 per week as "Management Fees" that went to "common management" personnel at WSG and AGS.

20.     The funds of Vescom, AGS, and WSG were commingled.

21.     Vescom, AGS, and WSG were an integrated enterprise at the time of all relevant events.

22.     Vescom, AGS, and WSG collectively had 500 or more employees for each working day in each of 20 or more calendar weeks in the same calendar year as, or in the calendar year prior to, when the illegal conduct alleged in this case occurred.

23.     Ousama Karawia is a convicted felon.

24.     Ousama Karawia is the former owner of a security and investigations firm who was convicted of defrauding the state of California of millions of dollars in workers' compensation premiums.  In 2012, a jury found Ousama Karawia, 48, former president and chief executive of International Services Inc., guilty of seven felony counts, including grand theft of labor, two counts of insurance fraud and four counts of illegal possession of assault weapons.

25.     In 2014, the Court of Appeal of the State of California upheld Karawia's convictions.

## ADMINISTRATIVE PROCEEDINGS AND JURISDICTION

26.     Plaintiff Treadwell filed a timely complaint under oath with the Maine Human Rights Commission against defendants alleging unlawful discrimination on the basis of the WPA and the MHRA.

27.     Treadwell exhausted her administrative remedies.

4

28.     Treadwell satisfied the requirements of 5 M.R.S. § 4622.  Prior to filing this action, the Commission took action under 5 M.R.S. § 4612 as required by § 4622.

26.     This Court has jurisdiction over this action pursuant to 5 M.R.S. §§ 4613(1), 4621.

27.     Venue lies in Kennebec County pursuant to 14 M.R.S. § 501 and § 505.

28.     All four defendants were involved in the proceeding before the Maine Human Rights Commission and were represented by the same attorney in that process.

## JURY DEMAND

29.     Plaintiff demands trial by jury of all claims to the extent allowed by law.

## FACTUAL ALLEGATIONS

30.     Plaintiff Pamela Treadwell started working for Vescom in 1988.

31.     Ousama Karawia is an employee of the corporate defendants.  He was brought on board in 2009.

32.     Karawia was an employee not an independent contractor.

33.     As an employee, he devoted his time to the corporate defendants, he did not have an opportunity for profit or loss like a business owner, he did not perform work for others, he did not offer his services to the general public, his services were personal and could not be delegated, he worked at and had an office with the corporate defendants in Carson, California, there was and continues to be a relationship between Karawia and the corporate defendants, his tools and materials were supplied by AGS, and Karawia did not have his own license to operate.

34.     Karawia controlled and directed the activities of Vescom employees including Treadwell, Kathy Goodwin, Vescom's Director of Finance, and other administrative support personnel like Tina Baughman, Payroll Manager/H.R., and Carol Honnell, Accounts Payable/Accounting Clerk.

35.     On November 27, 2013, Treadwell sent an email to the owner of Vescom alerting him to the fact that Ousama Karawia was engaging in illegal conduct.

36.     For example, she notified Mr. Assal that Karawia had purchased a new insurance policy that was $100,000-200,000 more expensive than a plan proposed by Treadwell. The reason was that the policy chosen by Karawia had Vescom covering the employees of multiple other companies with those other companies illegally utilizing the lower mod rate that applied to just Vescom.[1] Because she did not want to put into a written document the actual fraud, she referred to it as "the bigger picture," knowing that Mr. Assal would know what that meant.

37.     She also notified the owner of Vescom about the state licenses for Vescom, reporting that Karawia should not be working for Vescom given that he was a felon. She reasonably believed that allowing a felon to work for a security company was a violation of law.

38.     Prior to this report of hers to the owner, Treadwell had explained to Mr. Assal that it was illegal to have Karawia play any part in Vescom because security companies are not allowed to have felons involved in their operation or management. Ousama Karawia is a felon and was on house arrest at the time.

39.     Treadwell and Assal have had several conversations about these illegalities. One of those reports to Assal occurred when one of the company's insurance agents had discovered that Karawia was associated with Vescom and the agent refused as a result to quote Vescom for general liability insurance because he believed Karawia's involvement violated the law.

40.     From that November 2013 email forward, Mr. Assal would not return Treadwell's calls, texts, or emails. It wasn't that he was just ignoring her; he was refusing to interact with her

---

[1]     A mod rate is similar an accident rate for, say, car insurance but includes many other factors. It applies to a company's workers' compensation insurance and the cost of that insurance. While Vescom had a low mod rate and thus much cheaper insurance costs, these other companies had high mod rates and thus higher costs. Illegally pretending that these other companies were actually just part of Vescom meant that the company was committing fraud in presenting those payroll numbers to the various states where it operated.

in any fashion at all, even on multi-million dollar projects. This shunning of his affected Treadwell's terms and conditions of employment.

41.    After this November 2013 email report of illegal conduct, Treadwell's relationship with Mr. Assal changed. Mr. Assal avoided all contact with her following that e-mail message, until February 2014, when she sent him another message regarding her concerns that Karawia was taking kick-backs from an insurance broker.

42.    In response to Treadwell's February 2014 report regarding illegal kickbacks, Assal sent her several scathing e-mails, and referred to her e-mail from November.

43.    Treadwell's belief that the company was engaged in illegal conduct by employing Karawia in ANY capacity was reasonable.

44.    Treadwell has copies of state licensing regulations which state clearly that a convicted felon cannot be hired in any capacity by a security company. A number of other persons in management also opined that it was illegal to have Karawia involved.

45.    Yet, after Treadwell reported this illegal connection to Mr. Assal and the numerous issues affecting her and other staff, he ended all contact with her in retaliation for that report. He only contacted her the next year, 2014, to angrily respond to her February 6 email about illegal kickbacks.

46.    In addition, Treadwell was retaliated against in a way that affected her compensation. She reported to Assal on Feb. 6, 2014, the issue of illegal kickbacks by an insurance agent to Karawia. *Days later* she was told by Karawia that she would need to start paying for coverage of her husband's health insurance, to the tune of $7,800.00 a year.

47.    In punishing Treadwell for reporting the illegal kickbacks, Karawia was punishing and penalizing Treadwell for exercising her civil rights and for complaining of violations of the Maine Human Rights Act, conduct prohibited by 5 M.R.S. 4553(10)(D).

48.   On March 7, 2014, Karawia emailed Treadwell and told her he had made a transfer of $25,000 into checking to cover checks issued the day before (not wage checks). He did not explain where that money came from or what checks it was going to be used to pay.

49.   He then informed Treadwell in that same email that he was leaving her with a negative $70,000 balance in the checking account that was used to pay employees their wages. Treadwell did not have any access to that account that would allow her to add money in to cover payroll, which Karawia knew in telling her this. He was telling her that all the wage checks, that had her name on them, were going to bounce – potentially several hundred checks amounting to several hundred thousand dollars.

50.   Treadwell understood this email to mean that Vescom was going to be issuing checks that had been legally earned by employees that the company was not going to honor. She believed that this activity would violate the law. She refused to take any part in that activity.

51.   Treadwell was forced to quit because she had no ability to move money into the account to cover those checks but she knew that, if she left the company before this fraud took place, they would have to honor those checks because they would not want to take responsibility for the fallout. If she had stayed, she would have been a part of the fraud *and* it would have permitted Karawia to dishonor the wage checks.

52.   By quitting, she forced Karawia to move money into the account to cover the checks because the fallout would have otherwise fallen on the owners and Karawia would not have let that happen to them. If he had let that happen so that the owners would take the fall, they would have had to have dealt with the fallout, including irate customers, employees leaving, the cost of reimbursing losses such as overdraft losses, and potentially a Department of Labor investigation and penalties. And, indeed, what Treadwell predicted was exactly what happened: after she quit, Karawia found money in some account that he was able to use to cover the wage

checks and avoid the "negative $70k" that he had threatened Treadwell that Treadwell would face.

53.     Not only is issuing checks that will bounce engaging in fraud, not paying employees their wages is a violation of both state and federal wage and hour laws. Treadwell did not want to be any part of that. She had no way to avoid being a part of it, though, unless she resigned.

54.     This conduct of Karawia's was also designed to punish and penalize Treadwell for exercising her civil rights.

55.     Karawia was emailing a threat that he was going to allow that to happen (he had unlimited ability to remove funds from the account used to make payroll and Treadwell had no access at all to additional funds). Because he had done this before at Vescom, she took him at his word.

56.     This prior issue with wage checks occurred in November of the year before (four months earlier). Treadwell had reported Karawia's earlier intent to not pay employees back on November 27, 2013, to Sherif Assal, the owner. Karawia allowed all the payroll checks to bounce right after that November 27 email.

57.     Violating wage laws was not a first for Karawia. He had also been convicted before for fraud and wage theft at another company before Vescom.

58.     Treadwell reasonably believed that, if they sent out hundreds of thousands in payroll compensation to employees that bounced, she would be subject to being convicted of a crime as part of the scheme to defraud employees of wages. It wasn't just a vague assumption on her part. Karawia was under house arrest at the time in March 2014, in part for doing that with his own employee's paychecks earlier. It's why she took his e-mail referencing that it was HER signature on those checks as a threat to her.

59.     Around this same time, near the end of February 2014, Kathy Goodwin, the Finance Director, went to Treadwell with state guard licenses that were subject to renewal. She told Treadwell that the documentation required attestation by Treadwell that all individuals working on behalf of or involved in the operation of Vescom were eligible to do so by law.

60.     The Finance Director pointed out that Karawia's involvement in the operation of the company was a direct violation of most states' laws. Signing the paperwork by Treadwell would have meant Treadwell presenting false information to state licensing authorities, which was criminal. Treadwell believed that signing the licenses would have been committing a crime.

61.     Treadwell knew from prior reports to her boss, Sherif Assal, that he would have insisted that she sign the licenses anyway, despite the illegality. Treadwell refused to be part of that criminal activity or commit the crime of illegally attesting that the company was in compliance. When Karawia shortly thereafter tried to make her part of the plan to bounce employee wage checks, Treadwell left rather than be a part of that or sign the licenses, both of which she believed were illegal, indeed criminal.

62.     Treadwell resigned on March 8, 2014, rather than take part in Ousama Karawia's scheme to allow payroll checks to bounce and rather than provide false information to state licensing authorities.

63.     In addition to being treated differently as a whistleblower, Treadwell was paid less than men performing comparable work. One of the men Treadwell was paid less than was Michael Baer.

64.     In July 2007, Treadwell took over all of Baer's duties. She performed both his duties and her own at that point. Nevertheless, she was never paid as much as he had been.

65.     Mr. Baer was paid a base salary of $110,000.00 and Treadwell was paid $100,000.00.

66.     Mr. Baer was paid 5% of gross sales for new accounts; Treadwell was paid nothing until 2012, and then only at a rate of 3%. In one year alone, Baer's commissions reached $159,000.00. The revenue increases from 2007 until 2012 would have generated nearly $500,000 in commissions, if paid to Treadwell as Baer had previously been paid.

67.     Mr. Baer received $900.00 a month for his vehicle reimbursement; Treadwell received $1000, but not until beginning in January, 2012, five years after she took over Baer's work.

68.     It was a violation of both the Maine Human Rights Act's prohibition against gender discrimination and Maine's Equal Pay Law to pay Treadwell less than Baer, among others.

## COUNT I
## VIOLATION OF WHISTLEBLOWERS' PROTECTION ACT
## 26 M.R.S. § 833(1)(A)

69.     Plaintiff realleges and hereby incorporates the paragraphs set forth above as if set forth in their entirety.

70.     Defendants intentionally discriminated against Treadwell with respect to tenure, transfer, compensation, terms, conditions or privileges of employment or any other matter directly or indirectly related to employment because of previous actions taken by Treadwell that are protected under the WPA, in violation of the MHRA, 5 M.R.S. § 4572(1)(A).

71.     Treadwell was singled out for treatment that non-whistleblowers were not. For example, Treadwell's insurance coverage for her spouse was taken away mere days after she reported illegal kickbacks.

72.     Treadwell reported to defendants what she had reasonable cause to believe were violations of state or federal law. 26 M.R.S. § 833(1)(A).

73.     As a result of this report, defendants took action to force her out absent agreement to join in their illegal activity.

74.     As a proximate result of defendants' unlawful conduct alleged herein, Treadwell has suffered job loss, lost income, emotional distress, loss of enjoyment of life, inconvenience, and other pecuniary and non-pecuniary losses.

75.     Treadwell has no plain, adequate or complete remedy at law to fully redress the wrongs alleged, and defendants are likely to perpetrate similar acts on others unless they are enjoined by this Court.

76.     Defendants' unlawful conduct alleged herein was intentional.

77.     Defendants' unlawful conduct alleged herein was undertaken with malice or with reckless indifference to Treadwell's rights.

## COUNT II
## VIOLATION OF WHISTLEBLOWERS' PROTECTION ACT
## 26 M.R.S. § 833(1)(D)

78.     Plaintiff realleges and hereby incorporates the paragraphs set forth above as if set forth in their entirety.

79.     Treadwell, acting in good faith, refused to carry out a directive to engage in activity that would be a violation of a law or rule adopted under the laws of this State, a political subdivision of this State or the United States.

80.     As a proximate result of defendants' unlawful conduct alleged herein, Treadwell has suffered job loss, lost income, emotional distress, loss of enjoyment of life, inconvenience, and other pecuniary and non-pecuniary losses.

81.     Treadwell has no plain, adequate or complete remedy at law to fully redress the wrongs alleged, and Defendants are likely to perpetrate similar acts on others unless they are enjoined by this Court.

82.     Defendants' unlawful conduct alleged herein was intentional.

83.     Defendants' unlawful conduct alleged herein was undertaken with malice or with reckless indifference to Treadwell's rights.

84.     Treadwell's only way to avoid engaging in wage fraud, and in signing paperwork illegally representing Vescom to be in compliance despite its employment of a felon, was to resign.  She had to resign to avoid engaging in illegal and criminal activity.

## COUNT III
## VIOLATION OF MAINE HUMAN RIGHTS ACT
## 5 M.R.S. § 4553(10)(D)

85.     Plaintiff realleges and hereby incorporates the paragraphs set forth above as if set forth in their entirety.

86.     Defendants committed unlawful discrimination as prohibited by the Maine Human Rights Act pursuant to 5 M.R.S. § 4553(10)(D).

87.     Defendant Ousama Karawia is a person covered by § 4553(10)(D).

88.     Karawia aided, abetted, and incited the corporate defendants in unlawful discrimination against Treadwell.

89.     Defendants attempted to engage in acts of unlawful discrimination as prohibited by § 4553(10)(D).

90.     Defendants punished and penalized, and attempted to punish and penalize, Treadwell for seeking to exercise her rights as declared by the Maine Human Rights Act.

91.     As just one example, Karawia illegally punished Treadwell by removing her husband's health care coverage after she reported kickbacks he was taking and then tried to force her to commit wage fraud, which forced her to resign to avoid such fraud.

92.     The corporate defendants discriminated against Treadwell.  One example was defendants' retaliation against Treadwell for reporting to Assal that Karawia's presence in the

13

company as a felon was illegal and that an insurance provider refused to quote insurance as a result.

93. As a proximate result of defendants' unlawful conduct alleged herein, Treadwell has suffered job loss, lost income, emotional distress, loss of enjoyment of life, inconvenience, and other pecuniary and non-pecuniary losses.

94. Treadwell has no plain, adequate or complete remedy at law to fully redress the wrongs alleged, and defendants are likely to perpetrate similar acts on others unless they are enjoined by this Court.

95. Defendants' unlawful conduct alleged herein was intentional.

96. Defendants' unlawful conduct alleged herein was undertaken with malice or with reckless indifference to Treadwell's rights.

<u>COUNT IV</u>
## VIOLATION OF MAINE HUMAN RIGHTS ACT AND MAINE'S EQUAL PAY ACT

97. Plaintiff realleges and hereby incorporates the paragraphs set forth above as if set forth in their entirety.

98. Treadwell was not paid the same wages as men performing comparable work. Instead, she was paid far less.

99. Defendants violated 26 M.R.S. § 628 and the Maine Human Rights Act's prohibitions against gender discrimination.

100. Compared to Baer, a male, for example, the difference was staggering despite them doing the same work (indeed, Treadwell did more than Baer when in his position):

| Salary to Baer | | Salary to Treadwell | Commissions Unpaid |
|---|---|---|---|
| 2007 | $108,000 | $100,000 | $112,153.65 |
| 2008 | $108,000 | $100,000 | $104,725.55 |
| 2009 | $108,000 | $100,000 | $82,059.60 |
| 2010 | $108,000 | $100,000 | $49,960.05 |

| 2011 | $108,000 | $100,000 | $107,135.45 |
| 2012 | $108,000 | $100,000 | $33,737.36 (2% not paid; rec'd 3% only) |
| 2014 | | | |

Total Difference in Compensation: $48,000 (wages) plus $489,772 (commissions owed to Treadwell using same calculations as for Baer, if they had been treated the same) plus $7800 (that Treadwell had to pay for coverage of her husband's health insurance benefits starting in February 2014).

101.    As a proximate result of defendants' unlawful conduct alleged herein, Treadwell has suffered job loss, lost income, emotional distress, loss of enjoyment of life, inconvenience, and other pecuniary and non-pecuniary losses.

102.    By paying Treadwell less than men performing comparable work, defendants violated both the Maine Human Rights Act and the Maine Equal Pay Act.

103.    Treadwell has no plain, adequate or complete remedy at law to fully redress the wrongs alleged, and defendants are likely to perpetrate similar acts on others unless they are enjoined by this Court.

104.    Defendants' unlawful conduct alleged herein was intentional.

105.    Defendants' unlawful conduct alleged herein was undertaken with malice or with reckless indifference to Treadwell's rights.

**PRAYER FOR RELIEF**

Treadwell prays that this Court enter an Order providing as follows:

A.    Enter judgment declaring that the defendants' practices complained of herein are unlawful as alleged;

B.    Grant Treadwell a permanent injunction enjoining defendants, their officers, agents, successors, employees, attorneys and assigns and other representatives, and all persons acting in concert with them and at their direction, from engaging in any employment policy or practice which retaliates against Treadwell for exercising her rights under the WPA or the MHRA;

15

     C.     Order defendants to make Treadwell whole by providing reinstatement and/or front pay, appropriate back pay, and reimbursement for lost pension, health, Social Security, and other benefits in amounts to be shown at trial;

     D.     Order defendants to pay Treadwell compensatory damages for non-pecuniary losses, including, but not limited to, pain and suffering, psychological upset, and interference with the enjoyment of life;

     E.     Order defendants to pay Treadwell punitive damages;

     F.     Order defendants to pay Treadwell civil penal damages pursuant to 5 M.R.S. § 4613(2)(B)(7);

     G.     Order defendants to pay all litigation costs and expert witness fees;

     H.     Order defendants to pay Treadwell nominal damages;

     I.     Order defendants to pay pre-judgment, post-judgment interest, and reasonable attorneys' fees to Treadwell;

     J.     Order defendants to pay Treadwell what she would have earned had she received the same pay as Baer; and

     K.     Grant such additional relief as this Court deems appropriate.

Respectfully submitted,

_Rebecca S. Webber, Esq. (Bar No. 7908)_
Jordan Payne Hay, Esq. (Bar No. 5611)
*Attorneys for Plaintiff*
SKELTON TAINTOR & ABBOTT
95 Main Street, Auburn, Maine 04210
(207) 784-3200
rwebber@sta-law.com
jphay@sta-law.com

DATED:  January 4, 2017

16